# In the United States Court of Federal Claims

No. 18-1411C
Filed: May 21, 2019

```
* * * * * * * * * * * * * *    *
                                *
LITE MACHINES CORPORATION,      *
                                *     Motion to Dismiss; Contract
            Plaintiff,          *     Disputes Act; Breach of Contract;
                                *     Small   Business   Innovation
        v.                      *     Research   Program;   Christian
                                *     Doctrine; Lost Profits; Implied-in-
UNITED STATES,                  *     Fact Contract.
                                *
            Defendant.          *
                                *
                                *
* * * * * * * * * * * * * *    *
```

Ronald J. Waicukauski, Price Waicukauski Joven & Catlin, LLC, Indianapolis, IN, for plaintiff. Of counsel were Brad A. Catlin, Price Waicukauski Joven & Catlin, LLC, Indianapolis, IN, and Jonathan Cain, FisherBroyles, LLP, Washington, D.C.

James W. Poirier, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Robert E. Kirschman, Jr., Director, Commercial Litigation Branch, and Joseph H. Hunt, Assistant Attorney General, Civil Division, Department of Justice.

## O P I N I O N

### HORN, J.

In the above-captioned case, plaintiff Lite Machines Corporation (Lite Machines) alleges that the United States, acting through the United States Air Force (Air Force), breached a contract it entered into with Lite Machines in 2013.

## FINDINGS OF FACT

According to plaintiff's amended complaint, Lite Machines is a privately-held small business headquartered in West Lafayette, Indiana. Plaintiff states that the United States Department of Defense previously has awarded Lite Machines over $30,000,000.00 in Small Business Innovation Research (SBIR) contracts and Small Business Technology Transfer (STTR) contracts[1] under which Lite Machines "develop[ed] technologies

---

[1] At the oral argument in the above-captioned case, counsel of record for plaintiff stated that he had included information related to the STTR program because "I think it's part of our complaint only because it's part of the history." As discussed below, the contract at issue in the above-captioned case, however, was issued under the SBIR program, and

related to unmanned aerial vehicles."

The Small Business Administration describes the SBIR program as a "highly competitive program that encourages domestic small businesses to engage in Federal Research/Research and Development (R/R&D) that has the potential for commercialization. Through a competitive awards-based program, SBIR enables small businesses to explore their technological potential and provides the incentive to profit from its commercialization." See About SBIR, SMALL BUS. ADMIN., https://www.sbir.gov/about/about-sbir (last visited May 21, 2019). The statute at 15 U.S.C. § 638 (2012)[2] defines the SBIR program as "a program under which a portion of a Federal agency's research or research and development effort is reserved for award to small business concerns through a uniform process having" three phases. 15 U.S.C. § 638(e)(4). The first phase of the SBIR program, referred to as Phase I, is defined in the statute as being used "for determining, insofar as possible, the scientific and technical merit and feasibility of ideas that appear to have commercial potential," which are submitted in response to "SBIR program solicitations." 15 U.S.C. § 638(e)(4)(A).

The second phase of the SBIR program, referred to as Phase II, is defined in the statute as being used to "further develop proposals which meet particular program needs, in which awards shall be made based on the scientific and technical merit and feasibility of the proposals, as evidenced by the first phase, considering, among other things, the proposal's commercial potential." 15 U.S.C. § 638(e)(4)(B). A proposal's commercial potential is to be determined in reference to the "small business concern's record of successfully commercializing SBIR or other research," "the existence of second phase funding commitments from private sector or non-SBIR funding sources," the existence of Phase III "follow-on commitments" related to the "subject of the research," and "the presence of other indicators of the commercial potential of the idea." See id. The statute at 15 U.S.C. § 638 defines the third phase of the SBIR program, referred to as Phase III, as follows:

> [W]here appropriate, a third phase for work that derives from, extends, or completes efforts made under prior funding agreements under the SBIR program--
>
> (i) in which commercial applications of SBIR-funded research or research and development are funded by non-Federal sources of capital or, for products or services intended for use by the Federal Government, by follow-on non-SBIR Federal funding awards; or

---

this case does not involve contracts awarded under the STTR program.

[2] The statute at 15 U.S.C. § 638 (2012) has been updated several times since 2012. The version of 15 U.S.C. § 638 in effect when Lite Machines entered its October 9, 2013 Contract, however, was the 2012 version, and the version of 15 U.S.C. § 638 cited by both plaintiff and defendant is the 2012 version. The court, therefore, cites to 15 U.S.C. § 638 (2012) throughout its analysis of plaintiff's claims in this Opinion, unless otherwise indicated.

(ii) for which awards from non-SBIR Federal funding sources are used for the continuation of research or research and development that has been competitively selected using peer review or merit-based selection procedures.

15 U.S.C. § 638(e)(4)(c).

The Small Business Administration describes the STTR program as "another program that expands funding opportunities in the federal innovation research and development (R&D) arena," and states that the "unique feature of the STTR program is the requirement for the small business to formally collaborate with a research institution in Phase I and Phase II." See About STTR, SMALL BUS. ADMIN., https://www.sbir.gov/about/about-sttr (last visited May 21, 2019). The statute at 15 U.S.C. § 638 defines the STTR program as a program "under which a portion of a Federal agency's extramural research or research and development effort is reserved for award to small business concerns for cooperative research and development through a uniform process having" three phases.[3] 15 U.S.C. § 638(e)(6). Phase I of the STTR program is defined in the statute as being used to determine the "scientific, technical, and commercial merit and feasibility of ideas submitted pursuant to STTR program solicitations." 15 U.S.C. § 638(e)(6)(A). Phase II of the STTR program is defined as being used to "further develop proposals that meet particular program needs." 15 U.S.C. § 638(e)(6)(B). The statute at 15 U.S.C. § 638(e)(6)(C) defines Phase III of the STTR program as being used, "where appropriate," for "work that derives from, extends, or completes efforts made under prior funding agreements under the STTR program," which is funded "by non-Federal sources of capital," "follow-on non-STTR Federal funding awards," or "awards from non-STTR Federal funding sources." 15 U.S.C. § 638(e)(6)(C). The statute at 15 U.S.C. § 638(r)(4) states that, "[t]o the greatest extent practicable, Federal agencies and Federal prime contractors shall issue Phase III awards relating to technology, including sole source awards, to the SBIR and STTR award recipients that developed the technology." 15 U.S.C. § 638(r)(4).

---

[3] According to one commentator:

The major difference between the SBIR program, which involves small businesses, and the STTR program is that the STTR program's purpose is to stimulate a partnership of ideas and technologies through cooperative research agreements between small business and research institutions (including educational institutions and Federally Funded Research and Development Centers (FFRDCs)) by means of federally funded research or research and development.

David R. White, Somewhat Different, Yet Surprisingly Familiar: Small Business Innovative Research Program and Small Business Technology Transfer Program Contract Award Protests, 38 PUB. CONT. L.J. 775, 777 (2009) (citing Small Business Technology Transfer Program Directive, 70 Fed. Reg. 74,925, 74,929 (Dec. 16, 2005)).

In the above-captioned case, plaintiff alleges that the Air Force awarded Lite Machines a "$1.6 million SBIR Phase II prime contract for development of the Tiger Moth Small Unmanned Aerial System ('SUAS')" in 2008. According to plaintiff's amended complaint, the Air Force provided Lite Machines with "an additional $1.3 million from the Air Force in SBIR Phase III funding to further develop and demonstrate the Tiger Moth SUAS" in 2010. According plaintiff:

> In early 2013, representatives of the Vice Chairman of the Joint Chiefs of Staff, Adm. [Admiral] James Winnefeld, contacted LMC [Lite Machines Corporation] for technical specifications for the Tiger Moth SUAS. On information and belief, in May 2013, the Vice Chairman of the Joint Chiefs issued a letter of needs defining a DoD [Department of Defense] requirement for the Tiger Moth SUAS ("T1 Requirements"). The T1 Requirements were designed to specify the Tiger Moth SUAS. On information and belief, the Air Force presented the T1 Requirements to Congress as a basis for obtaining funding to complete development of, commercialize and acquire a derivative of the Tiger Moth SUAS for the Department of Defense. On information and belief, Congress appropriated more than $100 million in funding to the Air Force based upon the T1 Requirements request.

On October 9, 2013, the Air Force awarded Contract No. xxx-14-D-0111 (the 2013 Contract) to Lite Machines.[4] Plaintiff asserts that the 2013 Contract was a "cost-reimbursement plus fixed-fee, incentive fee, indefinite delivery indefinite quantity, sole-source, SBIR Phase III prime contract (the 'Contract') for development and demonstration of the Tiger Moth SUAS." The 2013 Contract, as issued, stated that the maximum dollar amount the government could order under the 2013 Contract was $21,000,000.00, and the minimum dollar amount the government was obligated to order was $3,000.00. The period of performance of the 2013 Contract was up to seventy-two months after award of the 2013 Contract. The period of performance of task orders issued under the 2013 Contract was to be defined at the task order level.

---

[4] Defendant has filed a redacted, unclassified copy of the 2013 Contract, which partially redacts the contract number of the 2013 Contract, and a redacted, unclassified copy of Delivery Order/Call No. 0001 (Task Order 1), which is discussed below, as well as redacted, unclassified copies of the modifications issued to Task Order 1. The redacted, unclassified copy of the 2013 Contract redacts large portions of the text of the 2013 Contract, including sections of the performance work statement. Portions of the text of Task Order 1 and portions of the text of the modifications to Task Order 1 also are redacted in the copies submitted to the court.

That same day, on October 9, 2013, the Air Force issued Task Order 1 to Lite Machines under the 2013 Contract.[5] Task Order 1 had a period of performance of one year from the date of award, and the estimated total value of Task Order 1 was $9,668,228.00. Plaintiff indicates that the initial statement of work issued by the Air Force in Task Order 1, which plaintiff refers to as "SOW-1," related to the development of Lite Machines' Tiger Moth SUAS in accordance with the Air Force's T1 Requirements. According to plaintiff's amended complaint, the "Air Force's initial statement of work ('SOW-1') under TO-1 [Task Order 1] included two phases: Phase 1 involved rapidly demonstrating the Tiger Moth SUAS using commercially available parts, and Phase 2 called for demonstrating the system using line-of-sight radio communications." Plaintiff alleges, in its amended complaint, that SOW-1 in Task Order 1 was "defective" because "the Tiger Moth demonstration system specified by the Air Force in SOW-1 required use of components that did not meet the DoD's stated military requirements."

In plaintiff's amended complaint, plaintiff contends that Major Nate Klatt, who plaintiff identifies as the program manager of the Air Force's T1 Requirements, left his position with the federal government to pursue employment with Osterhout Design Group in 2014. Plaintiff's amended complaint indicates that Osterhout Design Group was Lite Machines' "primary subcontractor" for work related to the T1 Requirements. According to plaintiff, "while still employed by the Government, Major Klatt provided ODG [Osterhout Design Group] information about the Government's T1 Program procurement plans that he had never told LMC, including that the T1 Program had secured a $100 million dollar appropriation." Plaintiff alleges that, thereafter, Osterhout Design Group "increased the price it charged LMC and refused to continue working as LMC's subcontractor unless LMC agreed that ODG would be the prime contractor on the production contract." Plaintiff contends that, consequently, Lite Machines "was forced" to terminate Osterhout Design Group's subcontract and to subcontract with other companies, which allegedly increased Lite Machines' costs and delayed progress on the T1 Requirements.

In June 2014, plaintiff alleges that a new Air Force program manager for the Air Force's T1 Requirements "acknowledged that SOW-1 was a Government mistake" and "requested authority to issue a new statement of work" that met the Air Force's T1 Requirements. In September 2014, the Air Force issued a new statement of work related to the T1 Requirements, which plaintiff refers to as "SOW-2," under Task Order 1. Plaintiff argues that "SOW-2 greatly increased the scope of work, and required LMC to redesign the Tiger Moth SUAS and replace subcontractors that it had used to perform work under SOW-1."

---

[5] Plaintiff's amended complaint alleges that Task Order 1 was dated July 31, 2013 and was incorporated into the 2013 Contract. Task Order 1 is dated October 9, 2013 and contains signatures from Lite Machines' president and a government official, both of which are dated October 9, 2013. Task Order 1, however, lists a statement of work dated July 31, 2013 as an attachment to Task Order 1. The July 31, 2013 statement of work was not submitted to the court.

On October 7, 2014, the Air Force issued a modification to Lite Machines' Task Order 1 extending the period of performance under Task Order 1 by three months, through January 8, 2015, without increasing the estimated total value of Task Order 1 from $9,668,228.00. On January 7, 2015, the Air Force issued another modification to Task Order 1 extending the period of performance by nine days, to January 17, 2015, at no cost to the government. On January 29, 2015, the Air Force issued a modification to Task Order 1, with an effective date of January 15, 2015, which had a stated purpose of "Cost Growth and Period of Performance Extension." (capitalization in original). The modification issued on January 29, 2015 extended Task Order 1's period of performance to February 14, 2015 and increased the estimated total value by $950,000.00 to $10,618,228.00.

In plaintiff's amended complaint, plaintiff contends that Lite Machines submitted an "estimated cost to complete SOW-2" to the Air Force, as well as a request for an equitable adjustment in the amount of "approximately $10 million." On March 5, 2015, the Air Force issued a modification to Task Order 1, with an effective date of February 14, 2015, which extended Task Order 1's period of performance through September 30, 2015. The March 5, 2015 modification increased the estimated total value of Task Order 1 by $9,034,933.00 to a new total value of $19,653,161.00. A statement of work dated August 31, 2014 is listed as an attachment to the March 5, 2015 modification to Task Order 1, but a copy of the August 31, 2014 statement of work was not included in the redacted, unclassified copy of the March 5, 2015 modification to Task Order 1 submitted to the court.

Plaintiff alleges that, during 2015, the Air Force changed its program manager for the T1 Requirements two more times. According to plaintiff, the "fourth program manager of the T1 Program determined that SOW-2 was inconsistent with the Air Force's own acquisition process and developed a third statement of work for TO-1 ('SOW-3') to replace SOW-2." Plaintiff's amended complaint provides:

> In August 2015, the Air Force issued SOW-3 to LMC. The purpose of SOW-3 was "to determine the risks of maturing the Tiger Moth [T1] system."
>
> In accordance with the Air Force acquisition process, SOW-3 required LMC to demonstrate T1 system components in a laboratory environment or simulated operating environment. It did not require LMC to demonstrate a complete T1 system in an operational environment. SOW-3 differed from SOW-2 in that SOW-3 specifically relieved LMC of the requirement to perform a number of tasks, including: performing an operationally representative mission, demonstrating the full flight envelope, demonstrating post-launch control and surface navigation, demonstrating collection of target imagery within the threshold conditions, and transferring imagery to a ground station.

(brackets in original). Also in August 2015, plaintiff alleges that the Air Force informed Lite Machines that the Air Force "wished to invest approximately $1.4 million in expiring year-

end funds in the T1 Program and invited LMC to submit a cost proposal for use of those funds under SOW-3." Plaintiff contends that, as of August 2015, Lite Machines "had used only a fraction of the funds allocated to TO-1 and had not requested more funding."

On August 18, 2015, the Air Force issued a modification to Task Order 1, which, "[p]ursuant to mutual agreement of the parties," increased the total value of Task Order 1 by $411,209.18 to $20,064,370.18 based on an increase of Lite Machines' indirect rates in 2013 and 2014. On September 29, 2015, the Air Force issued another modification to Task Order 1 with a stated purpose of "Cost Growth and Period of Performance Extension." (capitalization in original). The September 29, 2015 modification extended the period of performance under Task Order 1 through May 15, 2016 and increased the total value of Task Order 1 by $1,489,858.76 to $21,554,228.94.[6] A third statement of work, which the September 29, 2015 modification indicates is dated September 17, 2015, is listed as an attachment to the September 29, 2015 modification, but a copy of the September 17, 2015 statement of work was not included in the redacted, unclassified copy of the September 29, 2015 modification to Task Order 1 submitted to the court. Plaintiff contends that the "$1.4 million added by the Air Force for SOW-3 was made at the discretion of the Air Force and was not the result of a cost overrun by LMC."

In December 2015, plaintiff alleges that the Air Force informed Lite Machines that "LMC had met the exit criteria for SOW-3 and that the Air Force would soon begin negotiating new task orders with LMC," and, in January 2016, plaintiff alleges that the Air Force "told LMC that LMC had met the requirements of SOW-3." Plaintiff's amended complaint asserts that, "[a]t the beginning of 2016, Government T1 program manager Scott Ashcraft advised LMC that he had three contracts for LMC sitting on his desk for T1 System production, RDT&E (Research, Development, Test and Evaluation) and support services for a period of three years and had received approval by the Air Force to start contract negotiations with LMC." In January 2016, however, plaintiff asserts that "the commanding officer of the T1 Program told LMC that he was not interested in laboratory demonstrations or simulations of the T1 system as set forth in SOW-3, but only in an end-to-end demonstration of the complete system in an operational environment." Plaintiff alleges that the Air Force requested that Lite Machines submit a cost estimate for such an "end-to-end demonstration," which plaintiff contends was outside the scope of SOW-3. According to plaintiff's amended complaint:

> At the same time that the Air Force was changing the requirements for successful completion of Task Order 1 for the third time, it was telling L-3 Unmanned Systems ("L-3"), one of LMC's subcontractors on the T1 Program, that LMC's technology was great and ahead of other solutions but that the Air Force was concerned that LMC might be unable to successfully manufacture the T1 System if the Air Force approved it for production. The Air Force encouraged L-3 to persuade LMC to allow L-3 to take over as prime contractor for the T1 Program and relegate LMC to the status of a

---

[6] As stated above, the terms of the 2013 Contract indicated that the maximum amount the government could order under the 2013 Contract was $21,000,000.00.

subcontractor to L-3.

On January 27, 2016, plaintiff states that it submitted a "revised cost estimate" to the Air Force totaling $6,954,599.80 in order "to complete the scope of work that the Air Force now stated that it wanted under SOW-3, *i.e.*, maturation and integration of the T1 components into a full system and demonstration of the T1 system on an operationally representative mission." (emphasis in original). On February 5, 2016, plaintiff alleges that the Air Force "suddenly and without warning" notified Lite Machines that further funding under the 2013 Contract was unavailable due to Lite Machines' cost overruns, and, subsequently, stated that Lite Machines should submit any amounts Lite Machines believed it was due as a claim under the Disputes clause in Lite Machines' 2013 Contract. According to plaintiff:

> On February 8, 2016, during a formal presentation to the Air Force, LMC strongly objected to the Air Force's discontinuation of funding and argued that there had been no cost overruns in the T1 Program and that the Air Force decision to discontinue LMC's funding was uninformed, arbitrary and capricious. During the February 8, 2016 meeting, the Air Force told LMC that it should finish development of the T1 system at its own cost and propose the system to the Air Force as a commercial off-the-shelf ("COTS") solution. Following this meeting, LMC halted development of the T1 system and laid off its technical work force.

Plaintiff's amended complaint asserts that, after notifying Lite Machines that the Air Force would no longer be funding work under the 2013 Contract, the Air Force conducted trade studies in an attempt to identify technologies, other than Lite Machines' Tiger Moth SUAS, that would satisfy the Air Force's T1 Requirements. Plaintiff states that the Air Force did not identify an adequate alternative technology and alleges that the Air Force "simplified the T1 Requirements and solicited other companies, including LMC's former subcontractors, to compete for development and production of the T1 Program."

On February 25, 2016, Lite Machines filed an agency-level protest with the Air Force, which the Air Force indicated it received on March 2, 2016.[7] Lite Machines' agency-level protest appears to have been filed by Paul Arlton, president of Lite Machines, as the cover page of Lite Machines' protest states that the "Point of Contact" for the protest was Paul Arlton. (capitalization in original). In the February 25, 2016

---

[7] Plaintiff's amended complaint in the above-captioned case did not mention that Lite Machines previously had filed an agency-level protest with the Air Force. At the oral argument, however, counsel of record for plaintiff in the above-captioned case, Ronald Waicukauski, discussed Lite Machines' protest with the Air Force and provided the court with a copy of the Air Force's March 7, 2016 decision dismissing plaintiff's protest, and defendant subsequently filed it on the court's docket on April 2, 2019.

protest, Lite Machines' request for relief included a "private PMR[8]" "followed by a technical review with the entire [redacted] management team," reinstatement of Lite Machines' funding under Task Order 1, and the award of a new task order to Lite Machines to conduct trade studies and market research. (redaction in original). Lite Machines' February 25, 2016 protest argued that, contrary to the Air Force's allegations, there had been no cost overruns under Task Order 1, and that the Air Force had "failed to conduct fact finding or negotiations on Lite's current ETC [estimate to complete] in accordance with FAR 15.405." Lite Machines also argued that, "[p]ursuant to USC 15 [sic] and Lite's sole-source prime contract the Government should discontinue any independent effort to find, develop or solicit alternative or improved solutions for [redacted] and instead assign such tasks to Lite under a new task order." (redaction in original). Lite Machines' February 25, 2016 agency-level protest with the Air Force does not appear to identify any solicitation or award of a contract that Lite Machines specifically was challenging.

On March 7, 2016, the Air Force issued a summary dismissal of Lite Machines' February 25, 2016 agency-level protest. In the March 7, 2016 dismissal, the Air Force stated:

> A solicitation does not exist and a competitive award is not pending. In addition, AQCS[9] has neither issued a cancellation or termination notice for TO-01. Further, Lite is not an "interested party" for the purpose of filing a protest as defined by FAR 33.101, as Lite is not an "actual or prospective offeror whose direct economic interest would be affected by the award of a contract or by the failure to award a contract.["] Accordingly, your submission fails to meet any protest criterions.

The Air Force further stated:

> The contract has been awarded and performance of the task order has commenced. As such, disputes arising under or relating to the contract are resolved in accordance with the Disputes clause of the contract (see FAR Subpart 33.2 and FAR 52.233-1). If Lite believes a valid dispute exists, please contact the undersigned [Brian Walters, procuring contracting officer] accordingly.

At the oral argument in the above-captioned case, counsel of record for plaintiff indicated that Lite Machines did not subsequently file a bid protest either at the United States Government Accountability Office or the United States Court of Federal Claims.

_____

[8] The term "PMR" was not defined in Lite Machines' February 25, 2016 agency-level protest.

[9] The term AQCS is not defined in the Air Force's March 7, 2016 dismissal of Lite Machines' February 25, 2016 agency-level protest.

In April 2016, plaintiff asserts that the Air Force informed Lite Machines that the Air Force would be removing "all classified documents, technical data and software connected with the T1 Program from LMC's offices in Indiana." Plaintiff's amended complaint provides:

> The Air Force then seized LMC's property, including the administrative records for LMC's Contract, SBIR data, limited rights data, restricted rights software and production equipment, and removed it to an Air Force facility. The Air Force simultaneously agreed to provide LMC with unclassified copies of LMC's own T1 Program files within 60 days. Despite multiple requests, however, the Air Force has refused to provide the unclassified files and has refused to return LMC's SBIR rights or limited rights technical data and restricted rights software seized by the Air Force in April 2016.

Plaintiff alleges that Lite Machines' "restricted rights software" included:

> [T]rade secrets related to T1 System components and methods of operation; T1 System operational capabilities and flight envelope; engineering designs and CAD (ComputerAided Design) drawings of system components including interfaces to the Government's launch platforms, engineering trade studies of alternate configurations and methods of operation of the T1 System to meet Government needs; technical analyses of multiple design options and recommendations of best approaches; technical reports and presentations analyzing the strengths and weaknesses of the Government's desired technical and acquisition approach; technical development plans for Block 0 T1 Systems and Pre-Planned Performance Improvements (PPPI); descriptions of systems and operational methods to overcome anticipated counter-technologies; high-level architectural diagrams and computer source code for communications and encryption software; low-level (die-level) firmware source code for BLOS (Beyond Line Of Sight) communications and data encryption; technical development plans to reduce SWAP (Size Weight And Power) of system components; electrical schematics for multiple system-level circuit boards; and flight test data.

(capitalization in original). In a footnote in the amended complaint, plaintiff asserts that some of the data seized by the Air Force may be classified and that plaintiff "reserves the right to amend these pleadings once it has been granted access to the classified record and can further specify the data items in a classified amendment."

According to plaintiff's amended complaint, the Air Force used the information seized from Lite Machines to set "new requirements" for the Air Force's T1 Requirements. In June 2016, plaintiff contends that the Air Force used Lite Machines' seized information to modify more than 120 system requirements in the T1 Requirements in a manner that favored Lite Machines' competitors, including AeroVironments, Inc. (AeroVironments) and L3 Unmanned Systems (L3). Plaintiff argues that the Air Force disclosed Lite

Machines' protected data to Lite Machines' competitors, including AeroVironments and L3.

Also in June 2016, plaintiff alleges that L3 informed Lite Machines that the Air Force had sent L3 a request for proposal containing revised requirements for the T1 Requirements. L3 allegedly stated to Lite Machines that it intended to respond to the Air Force's request for proposal and that L3 intended to invest $2,000,000.00 to $3,000,000.00 in production equipment related to the Air Force's T1 Requirements. L3 allegedly requested that Lite Machines serve as L3's subcontractor and technical advisor for L3's work on the Air Force's T1 Requirements. Plaintiff contends that, "[o]n June 28, 2016, LMC advised L-3 that LMC refused to become a subcontractor to L-3, and that it intended to enforce the non-compete clause of its subcontract with L-3." Lite Machines indicates that it informed the Air Force about the non-compete clause in the L3 subcontract.

Plaintiff argues that, after Lite Machines declined to serve as a subcontractor to L3, the Air Force awarded three contracts for "T1 System production, RDT&E (Research, Development, Test and Evaluation) and support services for a period of three years" to AeroVironments. According to plaintiff, "AeroVironments has publicly reported that it received $22.8 million in contracts for the Switchblade SUAS in September 2016, and $111.1 million since August 2017, for a total of $134 million. The awards made in 2017 included logistics support for three years." Plaintiff indicates that the Switchblade SUAS is a "small unmanned aerial system." According to plaintiff's amended complaint, "funding for the T1 Program for FY [fiscal years] 2016-2018 was obtained through sources other than the DoD's SBIR program, and, pursuant to 15 U.S.C [sic] § 638(e)(4)(c), such funding [for the T1 program] is deemed SBIR Phase III funding."

On February 20, 2018, plaintiff submitted a certified claim to an Air Force contracting officer, which sought "economic losses, including lost profits, sustained as a result of the Government's breach of its duties under the Contract with LMC." Plaintiff's amended complaint indicates that the contracting officer subsequently issued a contracting officer's final decision denying plaintiff's February 20, 2018 certified claim in full.

On September 14, 2018, plaintiff filed a complaint in the above-captioned case. On October 15, 2018, plaintiff filed its four-count amended complaint. Plaintiff's amended complaint asserts that "[t]his Court has subject matter jurisdiction of this action pursuant to 41 U.S.C. §§ 7104(b)(1) & (3) and 28 U.S.C. § 1491(a)(2)." In Count I, plaintiff alleges that "[t]he statute that authorizes the SBIR program, 15 U.S.C. § 638, requires that 'to the greatest extent practicable, Federal agencies and Federal prime contractors shall issue Phase III awards relating to technology, including sole source awards, to the SBIR and STTR award recipients that developed the technology.'" Plaintiff contends that the requirements in 15 U.S.C. § 638 were incorporated into the 2013 Contract "by operation of law" or, alternatively, through "the 'Christian doctrine.'"[10] According to Count I of

---

[10] The Christian doctrine, discussed below, refers to the case G. L. Christian & Associates

plaintiff's amended complaint, the actions taken by the Air Force "breached the requirement that it issue Phase III awards to LMC to the greatest extent practicable for research, development and production of products and services of the SUAS technology that LMC developed." At oral argument on defendant's motion to dismiss, counsel of record for plaintiff stated that, notwithstanding plaintiff's labeling of the <u>Christian</u> doctrine argument as an alternative argument, "I see the <u>Christian</u> doctrine as a subset of the operation of law, general principle." Plaintiff also stated that "I don't think" the argument involving incorporation by operation of law and the argument involving incorporation through the <u>Christian</u> doctrine are "separate arguments."

In Count II of the amended complaint, plaintiff alleges that the Air Force breached the "implied covenant of good faith and fair dealing." In Count III, plaintiff alleges that, "[i]f the Air Force did not breach a term of the [2013] Contract incorporated by the operation of law, then the Air Force breached an implied-in-fact contract to procure research, development and production of the T1 SUAS from LMC." In Count IV, plaintiff asserts that the Air Force breached the 2013 Contract by disclosing Lite Machines' SBIR data and limited rights data. Plaintiff's amended complaint seeks $28,000,000.00 in damages, plus interest, for "economic losses including lost profits," as well as attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412 (2018).

Defendant filed a motion to dismiss plaintiff's amended complaint, in its entirety, for failure to state a claim. In the motion to dismiss, defendant argued that, as a matter of law, Lite Machines is not entitled to recover lost profits that may have been earned on other, future contracts not actually awarded to Lite Machines. Plaintiff filed an opposition to defendant's motion to dismiss, arguing that each of the four counts in the amended complaint alleged plausible claims and that lost profits on future contracts can be recovered in the above-captioned case.

Prior to filing the above-captioned case, Lite Machines had filed a complaint in a related case, <u>Lite Machines Corp. v. United States</u>, Case No. 18-403C, which also is assigned to the undersigned, and similarly involves the same 2013 Contract. In Case No. 18-403C, Lite Machines' complaint in the other Lite Machines case currently before the court argues that the government breached the 2013 Contract by failing to reimburse Lite Machines for indirect costs allegedly incurred by Lite Machines and seeks damages as a result of the Air Force's alleged breach. Lite Machines is represented by Ronald Waicukauski in the above-captioned case, Case No. 18-1411C, and Lite Machines is represented by Jonathan Cain in the earlier filed case, Case No. 18-403C.[11] Defendant United States is represented by James Poirier in both Case No. 18-1411C and 18-403C.

In the above-captioned second case, Case No. 18-1411C, plaintiff filed a motion requesting oral argument on defendant's motion to dismiss "because the [defendant's]

---

<u>v. United States</u>, 160 Ct. Cl. 1, 312 F.2d 418, <u>reh'g denied</u>, 160 Ct. Cl. 58, 320 F.2d 345, <u>cert. denied</u>, 375 U.S. 954 (1963), <u>reh'g denied</u>, 376 U.S. 929 (1964).

[11] Plaintiff's filings in this case, Case No. 18-1411C, sporadically have listed Jonathan Cain as of counsel.

motion raises novel, complex and significant issues, the resolution of which may be aided by oral argument." The court granted plaintiff's motion, and the court heard oral argument in Case No. 18-1411C on April 1, 2019. James Poirier, counsel of record for defendant in the above-captioned case and in Case No. 18-403C, Ronald Waicukauski, counsel of record for Lite Machines in the above-captioned case, Case No. 18-1411C, and Jonathan Cain, counsel of record for plaintiff in the other Lite Machines case, Case No. 18-403C, attended the April 1, 2019 oral argument. Regarding the differences between the above-captioned case, Case No. 18-1411C, and the earlier filed Case No. 18-403C, Ronald Waicukauski stated: "That's a case [Case No. 18-403C] for a million dollars or so for indirect costs. This is a case where -- that involves, obviously, much more substantial claims for lost profits . . . ." Jonathan Cain stated that "the 403 case is purely a claim for costs -- indirect costs, additional indirect costs that were not compensated by the Government as a result of the Government's decision to fund no further work early in 2016." James Poirier asserted:

> The second case [Case No. 18-1411C], which as you know I think should be dismissed, but in any event, is all about future events. It's not related to anything that occurred during the contract. In fact, fairly construed, I don't think it seeks any kind of what we would consider ordinary contract damages. It doesn't seek any cost that was incurred during contract performance. All of the damages sought are lost profits in the future with regards to future contracts that they expected.

James Poirier described Case No. 18-403C as seeking "basically all the costs that they [Lite Machines] were able to find that they thought were associated with contract performance."

During the April 1, 2019 oral argument, it became apparent that Mr. Poirier, Mr. Waicukauski, and Mr. Cain disagreed as to whether, or to what extent, the Air Force had returned unclassified documents to Lite Machines in 2016. Also on April 1, 2019, the court issued an Order staying discovery, pending the parties' resolution with their respective clients of whether the Air Force had provided any or all requested unclassified documents to Lite Machines. On April 19, 2019, Mr. Waicukauski and Mr. Poirier filed a joint status report in the above-captioned case, in which the parties stated that the Air Force had removed a classified server containing approximately 77 gigabytes of files and data from a secure facility that was being used by Lite Machines in April 2016. The parties also stated that the Air Force had returned to Lite Machines approximately 8.34 gigabytes of files and data from the classified server on October 13, 2016, which Mr. Waicukauski and Mr. Cain appeared to be unaware of at the oral argument.

In the April 19, 2019 joint status report, the parties also "offer[ed] separate supplemental statements." In defendant's separate statement, defendant argued that the remaining documents on the classified server are classified, and that it is not improper for the Air Force to retain classified documents on the classified server. Defendant also asserts that "Lite Machines maintained an unclassified computer system at the secure facility, which Lite Machines has estimated to have contained 4,600 GB of documents."

Defendant contends that Lite Machines retained the unclassified documents after completion of the 2013 Contract, and that the 2013 Contract does not require that the Air Force declassify technical documents. In plaintiff's separate statement, plaintiff does not dispute defendant's representation that the Air Force has not withheld data from the unclassified server. Plaintiff, however, argues that the government continues to retain "the vast majority of the data on the classified server," which plaintiff asserts "may be relevant to the issues raised in" the above-captioned case, Case No. 18-1411C, or in the earlier Lite Machines case, Case No. 18-403C. Plaintiff states that it has "requested counsel for the United States to take steps necessary to ensure that this server is preserved."

Additionally, at the oral argument, counsel of record for plaintiff in the above-captioned case, Ronald Waicukauski, briefly referred to the fact that Lite Machines had submitted an additional certified claim to the Air Force's contracting officer seeking damages for lost enterprise value. On May 15, 2019, while the court was completing drafting an Opinion in the above-captioned case, Case No. 18-1411C, plaintiff filed a motion for leave to file a second amended complaint in the case, in which plaintiff stated:

> On April 22, 2019, while the motion to dismiss was pending, LMC's contracting officer issued a final decision denying LMC's claim for lost enterprise value associated with the causes of action described in LMC's complaint and first amended complaint.
>
> LMC has prepared a second amended complaint, which asserts (1) a Fifth Amendment takings claim (Count V), (2) a claim for compensation under 35 U.S.C. § 183 (Count VI), and (3) that it is entitled to lost enterprise value as a form of relief for these and its prior claims.

Plaintiff also stated that the "Government has consented in writing to LMC's request to add its claim for lost enterprise value. The Government does not consent to LMC's request to add Counts V and VI." Plaintiff attached its proposed second amended complaint to its May 15, 2019 motion. In the proposed second amended complaint, plaintiff seeks damages for lost enterprise value in the amount of $170,800,000.00. Defendant's response to plaintiff's motion for leave to file a second amended complaint currently is due on May 29, 2019, and the court has scheduled a conference with the parties in order to discuss plaintiff's May 15, 2019 motion.

This Opinion only addresses defendant's motion to dismiss regarding Count I and Count III of plaintiff's amended complaint and does not address plaintiff's motion to file a second amended complaint. In light of plaintiff's motion for leave to file a second amended complaint, the court, at this time, defers ruling on defendant's motion to dismiss Count II and Count IV of plaintiff's amended complaint, pending discussion with the parties at the conference.

**DISCUSSION**

In examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2018); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 562 U.S. 830 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief

in order to avoid dismissal for failure to state a claim." (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 570)); <u>Cary v. United States</u>, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555, 570)), <u>reh'g denied</u> (Fed. Cir.), <u>cert. denied</u>, 557 U.S. 937 (2009); <u>Christen v. United States</u>, 133 Fed. Cl. 226, 229 (2017); <u>Christian v. United States</u>, 131 Fed. Cl. 134, 144 (2017); <u>Vargas v. United States</u>, 114 Fed. Cl. 226, 232 (2014); <u>Fredericksburg Non-Profit Hous. Corp. v. United States</u>, 113 Fed. Cl. 244, 253 (2013), <u>aff'd</u>, 579 F. App'x 1004 (Fed. Cir. 2014); <u>Peninsula Grp. Capital Corp. v. United States</u>, 93 Fed. Cl. 720, 726-27 (2010), <u>appeal dismissed</u>, 454 F. App'x 900 (Fed. Cir. 2011); <u>Legal Aid Soc'y of N.Y. v. United States</u>, 92 Fed. Cl. 285, 292, 298 n.14 (2010).

When deciding a case based on a failure to state a claim, the court "must accept as true the factual allegations in the complaint." <u>Engage Learning, Inc. v. Salazar</u>, 660 F.3d 1346, 1355 (Fed. Cir. 2011); <u>see also</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555-56 (citing <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. at 508 n.1))); <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974) ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), <u>abrogated on other grounds by</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), <u>recognized by</u> <u>Davis v. Scherer</u>, 468 U.S. 183, 190 (1984); <u>Harris v. United States</u>, 868 F.3d 1376, 1379 (Fed. Cir. 2017) (citing <u>Call Henry, Inc. v. United States</u>, 855 F.3d 1348, 1354 (Fed. Cir. 2017)); <u>United Pac. Ins. Co. v. United States</u>, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); <u>Samish Indian Nation v. United States</u>, 419 F.3d 1355, 1364 (Fed. Cir. 2005); <u>Boise Cascade Corp. v. United States</u>, 296 F.3d 1339, 1343 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2002), <u>cert. denied</u>, 538 U.S. 906 (2003).

<u>Count I of Plaintiff's Amended Complaint</u>

In Count I of plaintiff's amended complaint, plaintiff alleges that the Air Force "breached the requirement that it issue Phase III awards to LMC to the greatest extent practicable for research, development and production of products and services of the SUAS technology that LMC developed." Plaintiff's complaint contends that the Air Force's duty to issue Phase III awards to Lite Machines to the greatest extent practicable is found in the statute at 15 U.S.C. § 638(r)(4) and is incorporated into Lite Machines' 2013 Contract "by operation of law" or through the <u>Christian</u> doctrine.

In defendant's motion to dismiss, defendant argues that the statute at 15 U.S.C. § 638(r) indicates only that Congress intended to establish a "procurement preference" for Phase III awards in certain SBIR procurements. Defendant argues that, because a "fundamental element of each count in the amended complaint is a challenge to a procurement decision by the United States, each count is 'an action by an interested party

objecting to . . . an award of a contract or any alleged violation of statute or regulation in connection with a procurement.'" (omission in original) (quoting 28 U.S.C. § 1491(b)(1)). Defendant asserts that plaintiff is seeking relief for an allegedly "faulty procurement decision by the United States, without bothering to file, or win, an actual bid protest."

Defendant also argues that "Lite admits that no express term of the [2013] contract supports Lite's alleged right to a procurement preference." (citing plaintiff's opposition to defendant's motion to dismiss). Defendant contends that the "statutory procurement preference" at 15 U.S.C. § 638(r)(4) should not be incorporated into Lite Machines' 2013 Contract because "courts have only incorporated legal provisions into contracts when that provision was pertinent *during the administration of the contract*." (emphasis in original). According to defendant, "[i]n this case, the agency had *no contractual obligation* to apply the statutory procurement preference *in the course of the performance* of Lite's contract. The award of a new contract was not within the scope of Lite's 2013 contract." (emphasis in original). Moreover, defendant asserts that the "scope of the 2013 contract is limited by, among other things, a maximum dollar amount of $21 million set forth in the 'Indefinite Quantity' clause," and that this court should reject plaintiff's attempt to "re-write" the 2013 Contract with terms that allegedly would render the maximum dollar amount limitation in the 2013 Contract "meaningless." Defendant further argues that plaintiff was not "eligible for the statutory preference it cites" at 15 U.S.C. § 638(r)(4) because plaintiff already had been awarded the 2013 Contract, which is a Phase III contract.

In plaintiff's opposition to defendant's motion to dismiss, plaintiff argues:

> Lite Machines developed the Tiger Moth SUAS pursuant to contracts issued as part of the SBIR program. Those contracts do not specify how Lite Machine's SUAS technology will be commercialized. But existing law fills this gap and requires that contracts for commercial applications of technology produced in an SBIR program be awarded to the small business which developed the technology "to the greatest extent practicable." 15 U.S.C. § 638(r)(4) (2012). Congress's intent when using this language is clear—if the United States is interested in having the technology developed in an SBIR program commercialized, it must make every effort to do so with the small business that developed that technology.

(internal reference omitted). Plaintiff argues that 15 U.S.C. § 638(r)(4) was incorporated into its 2013 Contract because "parties are presumed to be aware of existing laws and intend to incorporate them, even if those laws are not specifically included in the contract." According to plaintiff, 15 U.S.C. § 638(r)(4) is incorporated into the 2013 Contract under the <u>Christian</u> doctrine because "Congress has long favored small businesses in its procurement policies and first established the SBIR program in 1982" and 15 U.S.C. § 638(r)(4) requires that "agencies administering an SBIR program give Phase III contracts to the small business concern that developed the technology 'to the greatest extent practicable.'" (quoting 15 U.S.C. § 638(r)(4)). Plaintiff contends:

[T]he fact that past cases have not addressed a clause like this one is a matter of happenstance, not the basis for a rule of law. "If a proffered factual distinction between the case under consideration and pre-existing precedent does not change the force with which the precedent's underlying principle applies, the distinction is not meaningful." <u>Wright v. West</u>, 505 U.S. 277, 304, 112 S. Ct. 2482, 2497 (1992) (O'CONNER, J., joined by BLACKMUN and STEVENS, JJ., concurring in judgment). And the distinction the United States is trying to draw here has no bearing on the principles underlying the <u>Christian</u> doctrine—to ensure that fundamental procurement policies are followed in all procurement contracts.

(capitalization in original).

Plaintiff also asserts that the $21,000,000.00 "maximum dollar amount" in the 2013 Contract "has no bearing on whether Lite Machines enjoyed a preference for future contracts employing its SUAS technology." Plaintiff contends that, "[i]f the United States wished to enter into future contracts using that technology in excess of the $21 million described in the 2013 contract, then it was free to do so, so long as it awarded those contracts to Lite Machines to the greatest extent practicable." In plaintiff's opposition, plaintiff argues that, contrary to defendant's interpretation of 15 U.S.C. § 638, "[t]here is no statute, rule or regulation saying that a small business gets only one SBIR Phase III contract."[12]

In 1925, in an appeal from the United States Court of Claims, the United States Supreme Court determined that a contract entered into by the government and a private corporation included a government right to "cancel" the contract, even though the right

---

[12] The parties dispute whether 15 U.S.C. § 638(r)(4) only applies to the first Phase III contract relating to technology developed as part of the SBIR program, or whether 15 U.S.C. § 638(r)(4) applies to additional Phase III contracts relating to technology developed as part of the SBIR program beyond the initial Phase III contract. Given the discussion below, however, the court need not resolve the parties' dispute at this time. Moreover, the court notes that defendant's argument that Lite Machines "was not eligible for the statutory preference it cites" relies on the language in 15 U.S.C. § 638(r)(2), which states "the term 'Phase III agreement' means a follow-on, non-SBIR or non-STTR funded contract as described in paragraph (4)(C) or paragraph (6)(C) of subsection (e) of" 15 U.S.C. § 638. <u>See</u> 15 U.S.C. § 638(r)(2). Paragraph (4)(C) of subsection (e) discusses "follow-on non-SBIR Federal funding awards" and "awards." 15 U.S.C. § 638(e)(4)(C). The statute at 15 U.S.C. § 638(r)(4) also discusses "Phase III awards." 15 U.S.C. § 638(r)(4). Both 15 U.S.C. § 638(4)(C) and 15 U.S.C. § 638(r)(4) discuss "awards," not just an initial "award." <u>See</u> <u>also</u> Small Business Innovation Research Program Policy Directive, 77 Fed. Reg. at 46,820 ("There is no limit on the number, duration, type, or dollar value of Phase III awards made to a business concern. There is no limit on the time that may elapse between a Phase I or Phase II award and Phase III award, or between a Phase III award and any subsequent Phase III award. A Federal agency may enter into a Phase III SBIR agreement at any time with a Phase II awardee.").

was not included in the contract terms and "neither party knew that the United States had such a right," because the contract was entered into pursuant to a statute which provided the government with a right to "cancel." See Coll. Point Boat Corp. v. United States, 267 U.S. 12, 15-16 (1925). "The notion that certain legal mandates are treated as part of the contract ultimately became known as the Christian doctrine, named after G.L. Christian & Assocs. v. United States, 160 Ct. Cl. 1, 312 F.2d 418, 424-26 (1963), motion for rehearing denied, 160 Ct. Cl. 58, 320 F.2d 345 (1963)." Todd Constr., L.P. v. United States, 94 Fed. Cl. 100, 107 (2010), aff'd, 656 F.3d 1306 (Fed. Cir. 2011). The United States Court of Appeals for the Federal Circuit has stated:

> [U]nder the Christian doctrine, a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal administrative regulations. See Gen. Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775, 779 (Fed. Cir. 1993) (citing Christian I, 312 F.2d at 424, 427). In Christian, the Court of Claims concluded that the standard termination clause required by the Armed Service Procurement Regulations must be read into the contract, even though the contract lacked a termination clause. Christian I, 312 F.2d at 424-26. Accordingly, the court denied the contractor's breach-of-contract claim when the government terminated the construction contract for its own convenience. Id. at 427. For a court to incorporate a clause into a contract under the Christian doctrine, it generally must find (1) that the clause is mandatory; and (2) that it expresses a significant or deeply ingrained strand of public procurement policy. See Gen. Eng'g & Mach. Works, 991 F.2d at 779.

K-Con, Inc. v. Sec'y of Army, 908 F.3d 719, 724 (Fed. Cir. 2018); see also Call Henry, Inc. v. United States, 855 F.3d at 1352 ("Pursuant to the Christian doctrine, the mandatory SCA [McNamara-O'Hara Service Contract Act of 1965] clauses applicable to this contract are incorporated by reference, as those clauses reflect congressionally enacted, deeply ingrained procurement policy." (citations omitted)); S.J. Amoroso Constr. Co. v. United States, 12 F.3d 1072, 1075 (Fed. Cir. 1993); Gen. Eng'g & Mach. Works v. O'Keefe, 991 F.2d at 779 ("[T]he Christian Doctrine applies to mandatory contract clauses which express a significant or deeply ingrained strand of public procurement policy." (citations omitted)).

As stated by a judge of this court, under the Christian doctrine, "mandatory" "regulations are law, binding on the contract parties when otherwise applicable to the contract, and need not be physically incorporated into the contract." Bay Cty., Fla. v. United States, 112 Fed. Cl. 195, 203 (internal quotation marks and citations omitted), recons. denied, 2013 WL 5346523 (Fed. Cir. Sept. 25, 2013), aff'd, 796 F.3d 1369 (2015); see also Enron Fed. Sols., Inc. v. United States, 80 Fed. Cl. 382, 392 n.11 (2008) (stating that, under the Christian doctrine, "parties to a government contract are deemed to have agreed to contract terms required by law to be included in the contract" (citation omitted)); IBI Sec. Serv., Inc. v. United States, 19 Cl. Ct. 106, 109 (1989) ("The Christian doctrine is available only when relevant statutory or regulatory provisions are required to be included in an agency's contracts." (citations omitted)), aff'd, 918 F.2d 188 (Fed. Cir.

1990). Application of the <u>Christian</u> doctrine does not depend on whether the omission of a mandatory contract clause was intentional or inadvertent. <u>See</u> <u>Tolliver Grp., Inc. v. United States</u>, 140 Fed. Cl. 520, 529 (2018) ("The [<u>Christian</u>] doctrine turns on whether the contract omits a mandatory clause, not on whether the omission was intentional or inadvertent." (citing <u>Bay Cty., Fla. v. United States</u>, 112 Fed. Cl. at 202)); <u>see</u> <u>also</u> <u>S.J. Amoroso Constr. Co. v. United States</u>, 12 F.3d at 1075.

In <u>K-Con, Inc. v. Secretary of Army</u>, the United States Court of Appeals for the Federal Circuit indicated that the <u>Christian</u> doctrine has been applied to contract clauses, as well as to "substantive provisions." <u>K-Con, Inc. v. Sec'y of Army</u>, 908 F.3d at 727. According to the court in <u>K-Con, Inc.</u>, "[u]nder the first prong of the <u>Christian</u> doctrine, we examine whether the bonding requirements are 'mandatory' in government construction contracts." <u>Id.</u> at 724 (citation omitted). The Federal Circuit in <u>K-Con, Inc.</u> utilized the <u>Christian</u> doctrine to incorporate into a government contract a regulation requiring that a successful offeror must furnish performance and payment bonds to the government because the statute was deeply ingrained in public procurement policy and "the statute explicitly states that the bonds 'must' be furnished and the FAR both requires the bonds and directs insertion of the relevant clause." <u>Id.</u> at 723-26. Because the statute and the FAR required that the relevant clause be inserted into the contract in <u>K-Con, Inc.</u>, the Federal Circuit determined that "the bond requirements are mandatory." <u>Id.</u> at 725; <u>see id.</u> at 724 ("We conclude that they [the bonding requirements] are [mandatory] because they are required by statute."). The Federal Circuit in <u>K-Con, Inc.</u> also discussed the Federal Circuit's previous decision in <u>S.J. Amoroso Construction Co. v. United States</u>, 12 F.3d at 1075-76, as an example of when the <u>Christian</u> doctrine has been applied to incorporate "substantive provisions" into a government contract. <u>See</u> <u>K-Con, Inc. v. Sec'y of Army</u>, 908 F.3d at 727. In <u>S.J. Amoroso Construction Co.</u>, the Federal Circuit determined that the <u>Christian</u> doctrine incorporated the requirements of the Buy American Act into a government contract, as the Buy American Act was ingrained in public policy and "has long required in express terms that every construction contract for public buildings and works 'shall contain a provision that in the performance of the work' only American materials will be used." <u>S.J. Amoroso Constr. Co. v. United States</u>, 12 F.3d at 1075-76 (quoting 41 U.S.C. § 10b).

The statute at issue in the above-captioned case, 15 U.S.C. § 638, was amended by Section 5108 of the National Defense Authorization Act of 2012. <u>See</u> National Defense Authorization Act of 2012, Pub. L. No. 112-81, § 5108, 125 Stat. 1298 (2011). Section 5108 of the National Defense Authorization Act of 2012 provided:

**SEC. 5108. SBIR AND STTR SPECIAL ACQUISITION PREFERENCE.**

Section 9(r) of the Small Business Act (15 U.S.C. [§] 638(r)) is amended by adding at the end the following:

"(4) PHASE III AWARDS.--To the greatest extent practicable, Federal agencies and Federal prime contractors shall issue Phase III awards relating to technology, including sole source awards, to the SBIR and STTR

award recipients that developed the technology.".

Id. (emphasis and capitalization in original). When the Air Force awarded the 2013 Contract to Lite Machines, 15 U.S.C. § 638(r)(4) stated that, "[t]o the greatest extent practicable, Federal agencies and Federal prime contractors shall issue Phase III awards relating to technology, including sole source awards, to the SBIR and STTR award recipients that developed the technology." See 15 U.S.C. § 638(r)(4). The statute at 15 U.S.C. § 638, however, does not require that the government award a Phase III contract to a recipient of a Phase I or Phase II SBIR award under which the relevant technology was developed. Indeed, 15 U.S.C. § 638(e)(4)(c) indicates that Phase III contracts are to be awarded "where appropriate." 15 U.S.C. § 638(e)(4)(c); see also 15 U.S.C. § 638(r)(1) (stating that, when a small business concern is awarded a Phase II agreement, "a Federal agency may enter into a Phase III agreement with that business concern for additional work to be performed during or after the Phase II period" (emphasis added)).

The statute at 15 U.S.C. § 638(j) requires the Small Business Administration to issue policy directives regarding the "general conduct of small business innovation research programs." 15 U.S.C. § 638(j). In the Small Business Administration's policy directive in effect when the 2013 Contract was awarded to Lite Machines, which was published on August 6, 2012, the Small Business Administration reiterates that the government and prime contractors "that pursue R/R&D or production developed under the SBIR Program, shall issue Phase III awards relating to technology, including sole source awards, to the SBIR awardee that developed the technology" to "the greatest extent practicable." See Small Business Innovation Research Program Policy Directive, 77 Fed. Reg. 46,806, 46,820 (Aug. 6, 2012). The Small Business Administration's August 6, 2012 policy directive also indicates that, if the government or a prime contractor intends "to pursue R/R&D, production, services, or any combination thereof of a technology developed under an SBIR award, with an entity other than that SBIR awardee," the government or prime contractor must notify in writing the Small Business Administration prior to award and must indicate "why the follow-on funding agreement with the SBIR awardee is not practicable." Id.

The statute at 15 U.S.C. § 638(r)(4) appears to be aimed at encouraging, but not requiring, an agency to seriously consider awarding a contract to the developer of the technology in the context of a SBIR Phase III award relating to technology developed as part of the SBIR program. In the above-captioned case, 15 U.S.C. § 638(r)(4) indicates that the Air Force, "[t]o the greatest extent practicable," was to attempt to award the 2013 Contract, which the parties have indicated was an SBIR Phase III award, to the SBIR firm, Lite Machines, that developed the relevant technology, referred to by the plaintiff as the T1 Requirements. See 15 U.S.C. § 638(r)(4). After the Air Force indicated that it would no longer provide funding under the 2013 Contract, plaintiff contends that the Air Force was required to issue any future contracts related to the T1 Requirements to Lite Machines to the greatest extent practicable. Assuming the validity of plaintiff's argument that 15 U.S.C. § 638(r)(4) applies to more than just an initial Phase III award and to multiple Phase III awards, the Air Force perhaps should have considered awarding Lite Machines a Phase III contract to the greatest extent practicable for a procurement

involving the T1 Requirements. The statute at 15 U.S.C. § 638 and the Small Business Administration's policy directive, however, both indicate that the Air Force was not required to award a contract for the T1 Requirements to Lite Machines, as a result of the statute using the word "may." See 15 U.S.C. § 638(r)(1) ("[A] Federal agency may enter into a Phase III agreement with that business concern for additional work to be performed during or after the Phase II period." (emphasis added)); see also 15 U.S.C. § 638(e)(4)(C) (indicating that Phase III contracts are to be awarded "where appropriate"); Small Business Innovation Research Program Policy Directive, 77 Fed. Reg. at 46,820.

Moreover, the statute at 15 U.S.C. § 638(r)(4) is not framed as a contract clause that must be included or read into an awarded contract for technology developed under the SBIR program. In the Federal Acquisition Regulation (FAR), "'[c]ontract clause' or 'clause'" is defined as a "term or condition used in contracts or in both solicitations and contracts, and applying after contract award or both before and after award." FAR § 2.101 (2013). The plain language of 15 U.S.C. § 638(r)(4), which provides, "[t]o the greatest extent practicable, Federal agencies and Federal prime contractors shall issue Phase III awards relating to technology, including sole source awards, to the SBIR and STTR award recipients that developed the technology," does not require the award of a Phase III contract and does not appear to discuss the post-award actions of an agency or contractor. The language in 15 U.S.C. § 638(r)(4) also does not impose an obligation on the agency or contractor related to an awarded contract during the performance of the awarded contract. Rather, the language in 15 U.S.C. § 638(r)(4) expresses a pre-award preference, in the context of a Phase III award, that agencies shall attempt to award, to the greatest extent practicable, Phase III awards for technology developed as part of the SBIR program to the SBIR firm which developed the subject technology. Indeed, Section 5108 of the National Defense Authorization Act of 2012, which added subsection (r)(4) to 15 U.S.C. § 638, is titled as an "**SBIR AND STTR SPECIAL ACQUISITION PREFERENCE**," and appears only to direct that, prior to award, agencies consider using the contractor which developed the SBIR technology to the greatest extent practicable prior to awarding a Phase III award. See National Defense Authorization Act of 2012, Pub. L. No. 112-81, § 5108, 125 Stat. 1298 (2011) (emphasis and capitalization in original). As such, the relevance of 15 U.S.C. § 638(r)(4) is in the pre-award stage of a procurement, not during performance of a government contract. Thus, 15 U.S.C. § 638(r)(4) does not appear to be a contract clause applicable to performance under the 2013 Contract that would be read into or incorporated into the 2013 Contract via the Christian doctrine because 15 U.S.C. § 638(r)(4) does not apply to the performance of a government contract. See Night Vision Corp. v. United States, 68 Fed. Cl. 368, 384 (2005) (concluding that an argument that 15 U.S.C. § 638(j)(2)(c) was incorporated into a contract by the Christian doctrine "fails for the fundamental reason that § 638(j)(2)(C) offers nothing to incorporate" and "is not a contract clause at all" when "§ 638(j)(2)(C) merely directs the Administrator to establish certain *procedures* to ensure that 'follow-on' SBIR contracts will be awarded 'to the extent practicable'" (emphasis in original) (quoting 15 U.S.C. § 638(j)(2)(c))), aff'd, 469 F.3d 1369 (Fed. Cir. 2006).

Moreover, nowhere in the statement that, "[t]o the greatest extent practicable, Federal agencies and Federal prime contractors shall issue Phase III awards relating to

technology, including sole source awards, to the SBIR and STTR award recipients that developed the technology," is a requirement that the Air Force must have included the quoted language as a clause in the Lite Machines 2013 Contract. Plaintiff has argued that 15 U.S.C. § 638(r)(4) was required to be included in the 2013 Contract, but plaintiff has not cited to any provision of law which directed that the Air Force must include the statement in 15 U.S.C. § 638(r)(4) in Lite Machines' 2013 Contract. Nor do the other provisions in 15 U.S.C. § 638 or the Small Business Administration's August 6, 2012 policy directive appear to require the inclusion of such a clause. Consequently, 15 U.S.C. § 638(r)(4) differs from the "substantive provisions" at issue in K-Con, Inc. v. Secretary of Army, 908 F.3d 719, and S.J. Amoroso Construction Co. v. United States, 12 F.3d 1072, which analyzed statutes which did not include preference language and were deemed by the courts to require the inferred inclusion of certain clauses in government contracts. Because plaintiff has not cited any provision of law or regulation requiring that 15 U.S.C. § 638(r)(4) be inserted into Lite Machines' 2013 Contract or controverting the clear preference language in 15 U.S.C. § 638(r)(4), plaintiff's argument that 15 U.S.C. § 638(r)(4) was incorporated into Lite Machines' 2013 Contract under the Christian doctrine fails. Moreover, 15 U.S.C. § 638(r)(4) does not relate to performance under Lite Machines' 2013 Contract, which also defeats plaintiff's argument.

Plaintiff also generally argues that "'[t]he law in effect when a Government contract is made becomes part of the contract,'" and that "parties are presumed to be aware of existing laws and intend to incorporate them, even if those laws are not specifically included in the contract." (quoting Jackson v. United States, 216 Ct. Cl. 25, 573 F.2d 1189, 1195 (1978); and citing Ocean View Towers Assocs. v. United States, 88 Fed. Cl. 169, 176 (2009)). In Night Vision Corp., however, a contractor had argued that an earlier version of 15 U.S.C. § 638(j)(2)(C), which contained the same language as in 15 U.S.C. § 638(j)(2)(c) (2012),[13] "operates here to create a contractual entitlement to a SBIR Phase III contract and that the Air Force breached this provision when it decided not to award plaintiff a SBIR Phase III contract." See Night Vision Corp. v. United States, 68 Fed. Cl. at 381. The Night Vision Corp. court determined that, "[w]hile § 638(j)(2)(C) clearly directs the SBA Administrator to take action in issuing procedures, nowhere does it impose an obligation directly upon a procuring agency nor does it create any enforceable rights under a SBIR contract." Id. at 383. The Night Vision Corp. court stated:

> It is beyond doubt that, "[t]he law in effect when a Government contract is made becomes part of the contract." Jackson v. United States, [216 Ct. Cl. 25,] 573 F.2d 1189, 1195 (Ct. Cl. 1978). Nevertheless, this general principle only goes so far. Implicit in this rule is the requirement that the law sought to be incorporated is relevant—that it contains provisions relating to the formation or performance of the contract and thus imposes a particular duty or obligation on one or both of the parties. Here § 638(j)(2)(C) is irrelevant

---

[13] The statute at 15 U.S.C. § 638(j)(2)(c) (2012) states that the Administrator of the Small Business Administration is to issue policy directives to establish procedures for ensuring, "to the extent practicable," that agencies issue a Phase III award relating to a technology developed as part of the SBIR program to the SBIR firm which developed the technology.

to the contractual disputes of this case since it imposes no duty to award a SBIR Phase III contract.

Night Vision Corp. v. United States, 68 Fed. Cl. at 384 n.19 (brackets in original). On appeal, the United States Court of Appeals for the Federal Circuit affirmed the trial court's decision and stated that:

> Night Vision contends, however, that such a commitment was provided in a statutory provision which, it argues, the Phase I and Phase II contracts should be deemed to incorporate. It relies on the principle that "[t]he law in effect when a Government contract is made becomes a part of the contract." Jackson v. United States, 216 Ct. Cl. 25, 36, 573 F.2d 1189 (1978). Whatever may be the meaning and scope of that principle in other situations, however, the statute that Night Vision invokes does not provide such a commitment.

Night Vision Corp. v. United States, 469 F.3d 1369, 1373 (Fed. Cir. 2006), cert. denied, 550 U.S. 934 (2007).

In the above-captioned case, plaintiff's general argument is that the "law in effect when a Government contract is made becomes part of the contract." (internal quotation marks and citation omitted). In this case, 15 U.S.C. § 638(r)(4) may be relevant when an agency is deciding how to proceed with a procurement in the context of a Phase III SBIR award, but the statutory section does not mandate award to a particular entity or automatically relate back to performance of an earlier contract by dictating a future result. The statute at 15 U.S.C. § 638(r)(4) did not impose mandatory contractual obligations on the Air Force during performance or close out of the 2013 Contract just because 15 U.S.C. § 638(r)(4) was in effect when the 2013 Contract was executed. The Air Force, therefore, maintained its discretion as to how to proceed in the future.

Moreover, if plaintiff believed that the Air Force, when awarding three contracts to AeroVironments related to the T1 Requirements, had allegedly violated the statement in 15 U.S.C. § 638(r)(4) that an agency, to the greatest extent practicable, should award Phase III contracts to the SBIR firm which developed the desired technology, plaintiff was not without remedies. For example, plaintiff potentially could have filed a bid protest challenging the Air Force's award of contracts to AeroVironments.[14] See Toyon Research

---

[14] Paragraph 78 of Lite Machines' amended complaint states:

> At the beginning of 2016, Government T1 program manager Scott Ashcraft advised LMC that he had three contracts for LMC sitting on his desk for T1 System production, RDT&E (Research, Development, Test and Evaluation) and support services for a period of three years and had received approval by the Air Force to start contract negotiations with LMC. On information and belief, when LMC refused to become a subcontractor to L-3 in June 2016, the Government awarded these contracts to AeroVironments.

Corp., B-409765, 2014 WL 4058675, at *1, *6 (Comp. Gen. Aug. 5, 2014) (protesting an agency's alleged failure to "give the firm [the protestor] a preference in the procurement based on Toyon's [the protestor's] prior research and development of a distributed aperture satellite communications on-the-move system under Department of Defense Small Business Research Innovation program (SBIR) contracts with the agency" when the agency allegedly was procuring "phase III work").[15] Additionally, the Small Business Administration potentially could have filed an "appeal" with the Air Force regarding the Air Force's decision "to pursue Phase III work with a business concern other than the SBIR awardee that developed the technology to the head of the contracting activity." See Small Business Innovation Research Program Policy Directive, 77 Fed. Reg. at 46,820. The remedy for plaintiff, however, is not a breach of contract action involving the 2013 Contract, as 15 U.S.C. § 638(r)(4) was not incorporated into the 2013 Contract specifically or by operation of law.

Plaintiff also has not cited any express provision in the 2013 Contract or Task Order 1 related to the promise of an award of additional, future contracts to Lite Machines. Plaintiff has described the 2013 Contract as a "cost-reimbursement plus fixed-fee, incentive fee, indefinite delivery indefinite quantity, sole-source, SBIR Phase III prime contract (the 'Contract') for development and demonstration of the Tiger Moth SUAS." Lite Machines' 2013 Contract, as issued, stated that the minimum dollar amount the government could order under the 2013 Contract was $3,000.00, and that the maximum dollar amount the government could order under the 2013 Contract was $21,000,000.00. On February 5, 2016, when plaintiff alleges that "the Air Force suddenly and without warning informed LMC that its SBIR funding under the [2013] Contract was being discontinued," the Air Force already had issued the September 29, 2015 modification to Lite Machines' Task Order 1, which increased the total value of Task Order 1 to the maximum amount in the 2013 Contract. Neither the terms of Lite Machines' 2013 Contract nor the terms of Task Order 1 indicate that plaintiff had a mandatory right to receive additional, future contracts issued by the Air Force. Thus, the court dismisses Count I of plaintiff's amended complaint, as plaintiff has failed to plausibly allege that the Air Force had a contractual duty in the 2013 Contract to "issue Phase III awards to LMC to the greatest extent practicable for research, development and production of products and services of the SUAS technology that LMC developed," as alleged by plaintiff in the amended complaint.

―――――――――――――――――

At the oral argument in the above-captioned case, however, when asked about the three contracts identified in paragraph 78, counsel of record for plaintiff stated that "[w]e don't specifically assert that those were awarded." In Lite Machines' February 25, 2016 agency-level protest, Lite Machines did not identify a solicitation or awarded contract that it was challenging.

[15] In plaintiff's opposition to defendant's motion to dismiss, plaintiff argues that it did not file a bid protest because "Lite Machines is asserting that it had a contractual right to have any Phase III contract related to its SUAS technology awarded to it to the greatest extent practicable. This is not a classic bid protest. Rather, Lite Machines is asserting the breach of a contractual duty."

Count III of Plaintiff's Amended Complaint

In Count III of its amended complaint, plaintiff asserts:

In the event that the obligation of the Air Force to issue Phase III awards to LMC to the greatest extent practicable was not included in the Contract by the operation of law, then by entering into the Phase III contract for the T1 Program with LMC, the Air Force entered into a contract with LMC that included a provision implied-in-fact to procure research, development and production of T1 SUAS products and services from LMC.

Count III of plaintiff's amended complaint seeks "economic losses and the loss of the T1 Program along with the economic benefits, including lost profits, which LMC reasonably expected to obtain thereby." In defendant's motion to dismiss, defendant argues that plaintiff's implied-in-fact contract claim fails because there cannot be an implied-in-fact contract involving the same subject matter addressed in Lite Machines' 2013 Contract. Defendant argues, "[i]ndeed, Lite alleges that the implied-in-fact contract is so closely related to the express contract that the implied-in-fact contract is actually a 'provision' of the express contract." In response, plaintiff argues:

[T]he United States argues that Lite Machines may not allege both an express contract and an implied-in-fact contract on the same general subject matter, so the claim for an implied-in-fact contract should be dismissed. But Lite Machines is permitted to plead in the alternative, regardless of consistency. RCFC 8(d)(3); Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada, 687 F.3d 1266, 1280 (Fed. Cir. 2012). The fact that Lite Machines has done so here is not a valid basis for dismissal under RCFC 12(b)(6).

"An implied-in-fact contract is one founded upon a meeting of minds and 'is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (quoting Balt. & Ohio R.R. v. United States, 261 U.S. 592, 597 (1923)); see also Mendez v. United States, 121 Fed. Cl. 370, 378 n.3 (2015). "It is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (citing Atlas Corp. v. United States, 895 F.2d 745, 755 (Fed. Cir. 1990)); see also Lee v. United States, 895 F.3d 1363, 1370 (Fed. Cir. 2018) (citations omitted); Bank of Guam v. United States, 578 F.3d at 1329 (citations omitted); Gov't Servs. Corp. v. United States, 131 Fed. Cl. 409, 428 (2017) ("Plaintiff may not recover under an implied-in-fact contract when there is an express contract between the parties governing the same subject matter." (citing Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997))).

In the above-captioned case, regarding the alleged implied-in-fact contract, plaintiff's amended complaint asserts that "the Air Force entered into a contract with LMC that included a provision implied-in-fact to procure research, development and production of T1 SUAS products and services from LMC." Lite Machines asserts that the Air Force "breached the implied-in-fact agreement to acquire its T1 Requirements systems from LMC." Plaintiff's amended complaint also discusses the 2013 Contract, which was an express contract. Plaintiff's amended complaint asserts that "[o]ne of the purposes" of the 2013 express Contract was for Lite Machines "to complete research and development of the T1 SUAS and demonstrate that it was ready to enter the production phase of the Air Force's procurement process." According to plaintiff, the Air Force's "decision to award the" 2013 Contract to Lite Machines "implied" that the Air Force "agreed" that the requirements in 15 U.S.C. § 638, "including the requirement to procure research, development and production of T1 systems from the developer of the technology under earlier SBIR awards, would be included in the [2013] Contract." Moreover, plaintiff alleges that the Air Force's "T1 Requirements were designed to specify the Tiger Moth SUAS," and that the first statement of work under Task Order 1 "involved rapidly demonstrating the Tiger Moth SUAS using commercially available parts." Plaintiff also asserts that the "purpose of SOW-3 was 'to determine the risks of maturing the Tiger Moth [T1] system.'" (brackets in original).

As indicated in plaintiff's amended complaint, Lite Machines' 2013 Contract and plaintiff's alleged implied-in-fact contract both concern the Air Force's acquisition of the T1 Requirements from Lite Machines. Both the 2013 express Contract and the alleged implied-in-fact contract address the Air Force's acquisition of the same products, the T1 Requirements, from the same contractor, Lite Machines. Plaintiff's alleged implied-in-fact contract also would address the Air Force's acquisition of T1 Requirements from Lite Machines and, therefore, would not be "entirely unrelated" to the subject matter of Lite Machines' 2013 Contract. See Schism v. United States, 316 F.3d at 1278. Both the 2013 Contract and the alleged implied-in-fact contract specifically concern the obligations undertaken by the Air Force in its procurement of the T1 requirements, including the Tiger Moth SUAS, from Lite Machines. The 2013 Contract so closely overlaps the alleged implied-in-fact contract that plaintiff's amended complaint asserts that the obligations undertaken pursuant to the alleged implied-in-fact contract "would be included in the [2013] Contract." Consequently, plaintiff's alleged implied-in-fact contract is precluded as a matter of law, and the court dismisses Count III of plaintiff's amended complaint for failure to state a claim.

**CONCLUSION**

For the reasons articulated above, the court **GRANTS IN PART** defendant's motion to dismiss. Count I and Count III of plaintiff's October 15, 2018 amended complaint are **DISMISSED**. The court, at this time, **DEFERS** ruling on defendant's motion to dismiss Count II and Count IV of plaintiff's October 15, 2018 amended complaint.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**